**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA**

CASE NO. 07-21704-MC-TORRES

IN THE MATTER OF THE EXTRADITION
OF LUIS SABA STERN

_____/

**ORDER ON LUIS SABA STERN'S MOTION
FOR BOND AND TO PREVENT EXTRADITION
AND ON PETITION FOR EXTRADITION;
CERTIFICATION OF EXTRADITABILITY AND ORDER OF COMMITMENT**

This matter has come before this Court pursuant to 18 U.S.C. § 3181, *et. seq.*, for a hearing at the request of the Government of Mexico for the extradition of Luis Saba Stern ("Defendant"). Defendant filed a Motion for Bond and to Prevent Extradition (D.E. 14-1) to which the United States of America ("Government") filed an Opposition (D.E. 16) and Supplemental Motion to Set Extradition Hearing (D.E. 17). After having considered the evidence received at the hearing along with the argument of counsel, and the papers submitted prior to the hearing, this Court denies Defendant's Motion for Bond, and finds that Defendant is extraditable under the extradition treaty between the America and Mexico.[1]

### I. BACKGROUND

Defendant's extradition is sought by Mexico based on two arrest warrants issued in Mexico, both grounded in fraud.[2]

---

[1] Extradition Treaty Between the United States of America and the United Mexican States, U.S.-Mex., art. II, May 4, 1978, 31 U.S.T. 5059 (hereinafter "Treaty").

[2] The record and evidence presented at the extradition hearing provide the bases for the following findings of fact that are material to the issues presented, as well as any findings that may be found in the analysis portion of this Order.
Important to note, *Fraude Especifico* (specific fraud) carries a possible prison term of 6 to 12 years, while *Fraude Generico* (general fraud) carries a possible prison term of

### A. *The $12 Million Fraud: Failure to Produce or Deliver Fabric*

According to the information provided by the government of Mexico for case 207-2005, Defendant, on behalf of Bienes de Capital Quantum, S.A. de C.V. ("Capital Quantum") entered into a contract to sell textiles to Grupo Textil La Francia, S.A. de C.V. ("Grupo Textil"). David Cojab Cohen, a representative of Grupo Textil, made a series of advance payments to Defendant for this textile. Various witnesses who worked for Mr. Cojab Cohen, the Grupo Textil representative, witnessed him delivering cash payments to Defendant on a regular basis. For example, Jorge Vergara Sanchez and Mario Rosas Castillo, who worked as a driver and security guard, respectively, for Mr. Cojab Cohen, both offered statements that they accompanied Mr. Cojab Cohen when he went to deliver payments to Defendant.

On July 31, 2002, Defendant accepted the final installment, for a total payment of approximately $12 million (U.S.D.). Defendant signed a receipt for the aforementioned amount, and, pursuant to the contract terms, was supposed to deliver the fabric to Grupo Textil within 90 days. Capital Quantum failed to produce or deliver the fabric. Even more compelling, Defendant apparently never deposited the money into Capital Quantum's accounts.

Capital Quantum was actually owned by the Saba Stern family. Jorge Isaac Saba Stern, a Capital Quantum officer (who also happened to be Defendant's brother) confirmed Defendant's signature on the contract between Capital Quantum and Grupo Textil. Isaac Saba Stern further stated that the proceeds of this contract, the payments from Grupo Textil, were never deposited with Capital Quantum. In fact, he believes that Defendant entered into the deal with Grupo Textil knowing full well that Capital Quantum

---

4 to 6 years.

would not be able to adhere to the contract terms. Apparently, Capital Quantum was facing several economic and labor problems. Knowing this, Defendant offered Grupo Textil favorable contract terms because he never planned on fulfilling his end of the bargain. In fact, Mr. Saba Stern overheard Defendant discussing the fact that he (Defendant) was not going to produce the fabric, as Capital Quantum was likely going out of business.

In response to the Government's allegations, Defendant argued that there was no probable cause for the arrest warrants because the accusations against him were false. He explained that there was a long history of bad blood in the Saba Stern family, and that Isaac Saba Stern and other family members would benefit financially if Defendant were to be incarcerated. Defendant went so far as to suggest that his brother, his uncle, and members of the Cojab Cohen family bribed Mexican officials to have him arrested on up to nine different occasions for this *same* fraud, and that Defendant won each of those actions because the elements were never proven (D.E. 14-1 at 5).[3]

On one occasion, while incarcerated for this apparently bogus fraud charge, he was tortured by prison officials, and forced to sign a statement that he had received 122,670,543.77 pesos in cash on July 31, 2002. In fact, on that date, Defendant has documentary evidence that he was on a cruise with his family. Moreover, according to Defendant, there is no such thing as a "cent" in Mexican currency, suggesting that the aforementioned amount was fabricated by angry family members trying to frame him to take control of the family business.

---

[3] Defendant's Motion suggests that the criminal complaints were issued in different parts of the country so that no one would see the correlation between them.

### B.     *The $400,000 Fraud: Failure to Pay Promissory Notes*

The second warrant for case 198-2006 was based on three promissory notes totaling approximately $400,000 (U.S.D.) that Defendant signed to Grupo Alsavision S.A. de C.V. ("Grupo Alsavision") in 2002, in exchange for deliveries of fabric. Although Grupo Alsavision delivered the fabric, Defendant failed to pay on the promissory notes. Unlike case 207-2005 where Defendant received payment for fabric that he failed to deliver, here he received the fabric but failed to pay for it.

Several witnesses that worked for Grupo Alsavision claimed that they delivered the fabric to Defendant, and that he signed promissory notes in return. However, the only witness statement that could potentially establish probable cause under this charge came from Jose Eduardo Romero Contente, a longtime employee and accountant of the Saba Stern family. He stated that, at the time Defendant signed the notes, Capital Quantum was in such a dire financial situation that Defendant (and therefore Capital Quantum) could not have covered the debts.

Defendant responded that this dispute is, at best, characteristic of a civil matter.[4] He argued that, even if we accepted Mr. Contente's statements as true, there is still insufficient evidence to find probable cause for general fraud, let alone probable cause for intentional fraudulent misconduct.

---

[4]     The government actually conceded that case 198-2006 more closely resembled a civil contract dispute, as opposed to criminal fraud. In fact, the Government's requested a continuance to obtain additional written statements from Mexico to supplement its case, but was unable to procure additional evidence (D.E. 28).

## II.     ANALYSIS

### A.     *Petition for Extradition and Motion to Prevent Extradition*

The underlying petition for extradition seeks the Defendant's extraditition to Mexico for two counts of criminal fraud punishable under the laws of Mexico. Defendant's motion in opposition to the petition alleges that his prosecution resulted from collusion among the Cojab Cohen family, Rodolfo Felix Cardenas (the chief prosecutor of Mexico City), and certain members of Defendant's own family, over an internal struggle to obtain dominion of the Saba Stern family business. Defendant alleges, *inter alia,* that if he is extradited to Mexico, he will be harmed, tortured, or killed on the basis of false accusations of illegal acts which he claims he did not commit. Accordingly, we must determine whether Defendant is extraditable, and if he is, whether a "humanitarian exception" even exists that might potentially allow this Court to prevent extradition.

#### 1.     *General Principles of Extradition*

An extradition hearing held pursuant to 18 U.S.C. § 3184 (and the applicable Extradition Treaty) is not meant to be a trial on the merits, but instead "serves as a means of ensuring that probable cause exists to believe the person whose surrender is sought has committed the crime for which his extradition is requested." *Castro Bobadilla v. Reno,* 826 F. Supp. 1428, 1432 (S.D. Fla. 1993). The Secretary of State bears the responsibility for deciding whether surrender will ultimately occur. *Escobedo v. United States,* 623 F.2d 1098, 1105 n. 20 (5th Cir. 1980); 18 U.S.C. § 3186 (the Secretary of State "*may*" extradite the person committed under section 3184).

Here, the Government is seeking extradition based on two arrest warrants, and must prove several elements before Defendant is found extraditable by this Court:

> These elements roughly fall into six categories: (1) that the Court has jurisdiction to decide the question of extradition; (2) that a treaty of extradition exists between the United States and (Mexico) and that the

> crimes with which (Defendant) has been charged are covered by that treaty; (3) that (Defendant) has been charged with such offenses in the requesting country; (4) that the offenses with which (Defendant is charged in Mexico) are also offenses in the United States (dual criminality); (5) that there is some evidence warranting the finding that there is reasonable ground to believe (Defendant) is guilty (probable cause); and (6) that (Defendant) is the same individual charged with the offenses by the requesting party (identity).

*See In re Extradition of Lingad,* No. 06MG1278-POR, 2007 WL 628025, at *3 (S.D. Cal. Feb. 16, 2007). According to the moving papers, and the arguments of counsel at the extradition hearing, the only disputed issue is element five, probable cause.

### 2.   *Mexico Showed Probable Cause for the $12 Million Fraud*

Courts measure probable cause in an extradition hearing by the same federal standards used in preliminary hearings. *Bobadilla,* 826 F.Supp. at 1433 ("The federal probable cause standard requires 'evidence sufficient to cause a person of ordinary prudence and caution to conscientiously entertain a reasonable belief of the accused's guilt.'") (quoting *Republic of France v. Moghadam,* 617 F. Supp. 777, 782 (N.D. Cal. 1985)). Interestingly, hearsay and other evidence otherwise excluded at trial are admissible at an extradition hearing, but Defendant's right to introduce evidence is limited to testimony that explains (rather than contradicts) the demanding country's evidence. *See Bobadilla,* 826 F. Supp. at 1433.

Defendant made compelling arguments that the evidence was insufficient to sustain the charges against him on case 207-2005. However, for an extradition hearing, "(t)he magistrate does not inquire into the guilt or innocence of the accused; he looks only to see if there is evidence sufficient to show reasonable ground to believe the accused guilty." *Gusikoff v. United States,* 620 F.2d 459, 462 (5th Cir. 1980). After considering the documentary evidence introduced on behalf of Mexico, the defendant's opposition to extradition, oral arguments of counsel, and written memoranda, the Court finds that the

terms of the Treaty and 18 U.S.C. § 3184 have been met *only* with respect to case 207-2005, the $12 million fraud. The statements of the victims and Defendant's brother, coupled with documentary evidence bearing his signature, establishes probable cause for the fraud.

With respect to case 198-2006, the $400,000 fraud, we do *not* find that the Government established probable cause, as the evidence is glaringly insufficient to show probable cause to charge him with criminal fraud. The sole evidence against Defendant is the statement of an accountant suggesting Defendant was fiscally irresponsible for entering into a contract with a fabric distributor. According to the accountant, Defendant's company was in financial turmoil, and he would have been unable to make good on the promissory notes. Though compelling evidence at a civil trial for breach of contract, it hardly gives rise to probable cause for a criminal fraud charge. There was simply insufficient evidence to find probable cause that Defendant sought to defraud Grupo Alsavision.

Thus, we now examine whether a "humanitarian exception" exists that would allow us to refrain from issuing an order expediting Defendant to Mexico.

### 3. There is no "Humanitarian Exception" in a Judicial Extradition Proceeding

The crux of Defendant's argument against extradition is that he faces torture, and potential death, if he is returned to Mexico.[5] Under the traditional rule of "non-inquiry," such humanitarian considerations are within the exclusive purview of the executive branch and generally should not be addressed by the courts in determining whether a petitioner is extraditable. *Hoxha v. Levi*, 465 F.3d 554, 563 (3d Cir. 2006); *see also Sidali*

---

[5] Defendant also asserted that he is entitled to asylum under the Convention Against Torture. In light of the historic and statutorily limited role of the Magistrate Court in reviewing an extradition request, that claim is not properly raised with this Court.

*v. INS,* 107 F.3d 191, 195 n.7 (3d Cir. 1997) ("[W]e note that it is the function of the Secretary of State – not the courts – the determine whether extradition should be denied on humanitarian grounds.")

In *Escobedo,* a factually analogous case, a defendant contested extradition, alleging that he would be tortured or killed if he was surrendered to Mexican authorities. *Escobedo,* 623 F.2d at 1107. That Court held that the degree of risk to Escobedo's life was an issue that properly fell within the ambit of the executive, not the judiciary. *Id.* (quoting *Peroff v. Hylton,* 542 F.2d 1247, 1249 (4th Cir. 1976), *cert. denied,* 429 U.S. 1062, 97 S.Ct. 787, 50 L.Ed. 2d 778 (1977)).

We acknowledge that some federal courts have recognized the possibility of a "humanitarian exception" in preventing extradition based on the penalties that an extraditee will face upon his return. *See, e.g., Emami v. U.S. District Court,* 834 F.2d 1444, 1453 (9th Cir. 1987); *Arnbjornsdottir-Mendler v. United States,* 721 F.2d 679 (9th Cir. 1960). For instance, in *Gallina v. Fraser,* 278 F.2d 77, 79 (2d Cir. 1960), the Second Circuit suggested in dicta that an exception to the non-inquiry principle might exist in particularly extreme cases.

However, the Eleventh Circuit expressly rejected the *Gallina* dictum in *Martin v. Warden, Atlanta Penitentiary,* 993 F.2d 824, 830 n. 10 (11th Cir. 1993) ("We are aware, however, of no federal court decision that has actually blocked extradition on this ground .... [In *Escobedo* we] explicitly held that intervention in extradition proceedings based on humanitarian exceptions is inappropriate.") Simply put, the humanitarian exception remains quite theoretical because no federal court has applied it in the extradition context. *See Hoxha,* 465 F.3d at 563 n.10. As such, we find Defendant cannot avail himself of a humanitarian exception to prevent his extradition. The statutory scheme is

best applied by holding that any "humanitarian exception" is a matter left to the executive branch.

### B. *Motion for Bond*

In extradition cases, there is a presumption against bond. *Martin,* 993 F.2d at 827. Bail is only available in "special circumstances." *Id.* As the First Circuit explained:

> Previous cases have limited "special circumstances" to situations where "the justification is pressing as well as plain," and "in the most pressing circumstances, and when the requirements of justice are absolutely peremptory." Such circumstances may include a delayed extradition hearing, and the need of the defendant to consult with his attorney in a civil action upon which his "whole fortune" depends. In contrast, the discomfiture of jail, and even applicant's arguable acceptability as a tolerable bail risk, are not special circumstances.

*United States v. Williams,* 611 F.2d 914, 915, (1st Cir. 1979) (per curium) (quoting *In re Klein,* 46 F.2d 85 (S.D.N.Y. 1930), *In re Mitchell,* 171 F. 289 (S.D.N.Y. 1909) (citing *United States ex rel McNamara v. Henkel,* 46 F.2d 84 (S.D.N.Y. 1912) (delayed extradition hearing), *Klein* (discomfiture of jail), and *Beaulieu v. Hartigan,* 430 F.Supp. 915 (D.Mass. 1977*), rev'd w/o opinion,* 553 F.2d 91 (1st Cir. 1977) (arguable acceptability as bail risk)).

Defendant requested release on bond, but provided no compelling evidence or argument in support of his request in his motion, nor did he introduce any proof of special circumstances at the extradition hearing. The Government poignantly argues, and the Court agrees, that Defendant's fear of torture would substantially increase the risk of his non-appearance. We find that this situation is not tantamount to a "special circumstance" and deny Defendant's Motion for Bond.

* * *

### *III.  CONCLUSION*

For the foregoing reasons and solely with respect to Mexico's case 207-2005 the Court will Grant Mexico's Petition for Certification of Extraditability and Order of Commitment.

**IT IS THEREFORE ORDERED** that a certified copy of this Certification of Extraditability and Order of Commitment (and a copy of any documents or testimony submitted by or on behalf of the fugitive) be forwarded without delay by the Clerk to the Secretary of State at the Department of State, to the attention of the Office of the Legal Adviser, and to the Director, Office of International Affairs, Criminal Division, Department of Justice, Washington, D.C.;

**AND IT IS FURTHER ORDERED** that Luis Saba Stern remain in the custody of the United States Marshal for this District pending final disposition of this matter by the Secretary of State and surrender to designated agents of the Government of Mexico.

**DONE AND ENTERED** this 25th day of October, 2007, at Miami, Florida.

_____
EDWIN G. TORRES
United States Magistrate Judge

cc:   Office of International Affairs
      Criminal Division
      U.S. Department of Justice
      1301 New York Avenue, NW
      Washington, D.C.  20005
      Marc Osborne, AUSA
      Mark Eiglarsh, Esq.